Samuel C. HANNA, Plaintiff-Appellant,
Cross-Appellee,

v.

AMERICAN MOTORS CORPORATION,
Defendant-Appellee, Cross-Appellant.

Nos. 82–2931, 82–2980.

United States Court of Appeals,
Seventh Circuit.

Argued June 2, 1983.

Decided Jan. 9, 1984.

As Amended Jan. 13, 1984.

lost wages in the amount of $8,671.50 for the period between April 24, 1973, and November 14, 1977, and interest in the amount of $408.00. Cross-appellant, American Motors Corp., appeals the district court's ruling that *Ford Motor Co. v. EEOC,* 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982), is inapplicable to this case which arises under the Vietnam Era Veterans' Readjustment Assistance Act of 1974 (prior to 1982 amendment), 38 U.S.C. § 2021 *et seq.* (1976). We reverse the judgment of the district court as to the award of $8,671.50, and award appellant $28,905.00, plus prejudgment interest in the amount of $15,347.56, for the period between April 24, 1973, and November 14, 1977. In addition, we award the appellant prejudgment interest in the amount of $487.97 on the $1,100.74 in lost wages awarded by the district court for the period between December 18, 1970, and February 28, 1971.

Robert F. Sfasciotti, Kenosha, Wis., for plaintiff-appellant, cross-appellee.

Lawrence T. Lynch, Foley & Lardner, Milwaukee, Wis., for defendant-appellee, cross-appellant.

Before BAUER and COFFEY, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.*

COFFEY, Circuit Judge.

Appellant, cross-appellee, Samuel Hanna, appeals the judgment of the United States District Court for the Eastern District of Wisconsin, awarding him lost wages in the amount of $1,100.74 for the period between December 18, 1970, and February 28, 1971,

I

This court has considered appellant Samuel Hanna's complaint against American Motors Corporation ("AMC") on two prior occasions.[1] We initially set out the underlying facts in *Hanna v. American Motors Corp.,* 557 F.2d 118 (7th Cir.1977) (*"Hanna I"*), thus, for the purpose of this appeal we will only summarily review the facts pertinent to this decision.

On September 14, 1970, Hanna commenced work as an assemblyman at AMC's Kenosha, Wisconsin plant. Hanna earned "approximately $3.75 an hour" attaching bolts, bumper guards, and brake hoses to

* The Honorable Anthony J. Celebrezze, Senior Circuit Judge of the United States Court of Appeals for the Sixth Circuit, is sitting by designation.

1. The case originated in January 1975, when the Department of Justice, on behalf of Hanna, filed suit in the United States District Court for the Eastern District of Wisconsin, claiming that AMC had violated Hanna's rights under the Vietnam Era Veterans' Readjustment Assistance Act of 1974, 38 U.S.C. § 2021 *et seq.* (1976). In May 1976, the district court granted AMC's motion for summary judgment and dismissed the case. In June 1977, this court held

that AMC had, in fact, violated 38 U.S.C. § 2021 *et seq.* (1976), thus reversing the district court's judgment and remanding the case. *See Hanna v. American Motors Corp.,* 557 F.2d 118 (7th Cir.1977). In February 1979, the district court dismissed the case pursuant to Fed.R. Civ.P. 41(b) for failure to prosecute. In January 1981, this court, in an unpublished order, reversed the district court's dismissal and remanded the case for determination of damages. In October 1982, Hanna, acting through private counsel, proceeded to trial on the issue of damages in the United States District Court for the Eastern District of Wisconsin.

automobiles as they moved along an assembly line. On September 17, 1970, and December 3, 4, and 7, 1970, Hanna absented himself from work in order to undergo a mandatory military service preinduction physical examination. On all four of these days work was available for Hanna at the AMC plant in Kenosha. On December 18, 1970, AMC reduced its labor force and "laid off" Hanna, who up until that date had worked fifty-six days. Pursuant to the collective bargaining agreement between AMC and the United Auto Workers Union ("UAW"), of which Hanna was a member, if Hanna had worked sixty days, he would have completed his probationary period and would have been awarded seniority from September 14, 1970, the date of his original hiring. In addition, if Hanna had attained seniority status on or before December 18, 1970, he would not have been "laid off" until February 28, 1971.

On March 10, 1971, Hanna was inducted into the Armed Forces and while in military service he received a letter from AMC stating that because he had failed to complete his sixty-day probationary period within one year, as provided for in the UAW–AMC collective bargaining agreement, his employment at AMC had been terminated. Following almost two years of military service, including a nine-month stay in Vietnam, Hanna received an honorable discharge from the Armed Forces on February 22, 1973.

Upon returning to Kenosha, Wisconsin, Hanna contacted AMC about being reinstated to his previous job but was told by company officials that he had no reemployment rights. On March 22, 1973, AMC agreed to employ Hanna as a "new hire" performing "similar work" on the assembly line. On April 23, 1973, Hanna complained to AMC officials that they were violating his veteran's reemployment rights by refusing to accord him seniority from the date of his original hiring on September 14, 1970. Due to AMC's refusal to grant seniority,

Hanna left AMC the following day and was terminated by the company.

Hanna sought the assistance of his union, contacting UAW board members in an attempt to obtain reinstatement with seniority at AMC, but his efforts "didn't develop into anything."[2] Hanna next contacted the Department of Labor who, in turn, transferred the matter to the Department of Justice, who filed suit, on behalf of Hanna, against AMC claiming that the company had violated Hanna's rights under the Vietnam Era Veterans' Readjustment Assistance Act of 1974 (prior to 1982 amendment), 38 U.S.C. § 2021 et seq. (1976) ("Vietnam Veterans' Readjustment Act"). The district court granted AMC's motion for summary judgment and dismissed the case. The Government appealed and this court ruled that:

"But for the pre-induction physicals, plaintiff would have collected his salary until February 28, 1971, and would have been reinstated upon return from active duty with a September 14, 1970, date with all attendant rights under the collective bargaining agreement. Thus under the Act plaintiff is entitled to reinstatement with a September 14, 1970, seniority date and to collect lost wages from December 18, 1970, until at least February 28, 1971, his proper lay off date.[2] 38 U.S.C. § 2022; United States ex rel. Adams v. General Motors Corp., [525 F.2d 161 (6th Cir.1975)]. Plaintiff did not waive his rights under the Act by his April 24, 1973, refusal to continue in the inferior status accorded him by the defendant. O'Mara v. Petersen Sand & Gravel Co., 498 F.2d 896 (7th Cir.1974).

Accordingly the district court's judgment is reversed and remanded for further proceedings consistent herewith.

[2] He will also be entitled to recover lost wages from April 24, 1973, when he left defendant's employ, to date unless on remand defendant can show that plaintiff abandoned his willingness to continue in its employ under the conditions mandated by the Act when he

2. The record fails to indicate what action, if any, was taken by UAW board members after

they were contacted by Hanna.

enrolled in the University of Wisconsin-Parkside in September, 1973 as a student seeking a degree. *See Taylor v. Safeway Stores, Inc.,* 524 F.2d 263, 267–268 (10th Cir.1975)."

*Hanna I,* 557 F.2d at 122.

At the subsequent trial for damages, which is the subject of this appeal, the evidence revealed that following his termination date of April 24, 1973, Hanna visited the Kenosha Job Service office four times a month between June and September of 1973. A Job Service representative gave Hanna "five to ten" referrals which "didn't pan out to anything." On September 4, 1973, Hanna enrolled as a full-time, day student at the University of Wisconsin-Parkside ("UW-Parkside") in Kenosha, Wisconsin and thus began receiving veterans benefits under the "G.I. bill." UW-Parkside is "mainly a commuter school," that is attended in significant part (31%) by students over thirty years of age, "a number of" whom are employed full time. During the fall semester of 1973, Hanna filed "five to ten" applications with various employers and continued to visit the Kenosha Job Service office.

Between January 1974 and the "summer" of 1974, Hanna did not attend school but continued to follow up on referrals from the Kenosha Job Service office, though "nothing panned out." In the "summer" of 1974, through a friend's suggestion, Hanna landed a seasonal job as a general laborer, cutting grass and painting fences, for the Wisconsin Natural Gas Company in Racine, Wisconsin. Hanna continued at this job for "about a month," earning $598.00, and then quit because he "felt that as a Vietnam veteran [he] should be doing something more. . . ." Hanna testified that in September of 1974, he returned to UW-Parkside as a full-time day student because he "didn't have a job . . . and it was a means of getting some money and income and plus learning something." Between September 1974 and June 1975, Hanna filed applications at two factories in Waukegan, Illinois and one in Kenosha, Wisconsin. During this period Hanna also continued to visit the Kenosha Job Service office, and remained "ready, willing, and available to work at American Motors Corporation," or at any factory with comparable employment opportunities.[3] Even though Hanna did not file any application with "private employment services" during this period, he did continue to read the want-ads of the *Kenosha News* and drive his automobile to various factories in order to personally file job applications.

Hanna was unable to find employment during the "summer" of 1975, and in September he again enrolled in UW-Parkside as a full-time, day student. The testimony revealed that during the fall semester of 1975, Hanna "continued to seek full-time employment," but was unsuccessful in his efforts. Between February 1976 and January 1977, Hanna, while still attending school, filed additional employment applications at factories located in Waukegan, Illinois, Zion, Illinois, and Kenosha, Wisconsin but was offered no job. Hanna left school after the fall semester of 1976. In June 1977, after having had an application on file with the Kenosha Job Service for over four years, he obtained his first employment through the Job Service office in the "CETA" program, building campsites for the Kenosha City Parks Commission. Hanna worked at this job for "about two months" earning $1,312.00, and terminated his employment when the Government informed him of this court's decision in *Hanna I.* Following the decision in *Hanna I* on June 23, 1977, the district court issued two reinstatement orders before AMC complied and reinstated Hanna as an assemblyman, earning $4.25 an hour, on November 14, 1977. Hanna continued at this job for seven months until he was again discharged by AMC.

At the trial for damages, Kenneth Neill, supervisor of the Kenosha Job Service program, testified that his agency "counseled with a number of veterans" between April

---

**3.** The evidence revealed that at some time between April 24, 1973, and November 14, 1977, Hanna worked for a single day at Morelli's Overseas Export Company, but left because the "loading and unloading of hundred pound boxes" was "much too difficult."

24, 1973, and November 14, 1977, because the agency was "mandated by law to serve and provide priority [to] veterans," in order to help them readjust to society and overcome any effects of the then referred to "Vietnam Vet Syndrome." Neill further testified that there were five other "transportation equipment" plants in the area surrounding Kenosha but that AMC generally paid twenty to twenty-five percent more than the other employers. Neill concluded that there was "a high probability that a person [of general factory worker skills] would not be able to find a job comparable," to that of an AMC employee and that the closest comparable employer was the General Motors Corporation, some seventy miles away in Janesville, Wisconsin. In addition, the unemployment rate in Kenosha County ranged from 3.5 percent in 1973 to 8.5 percent in 1977, and the unemployment rate for a minority, such as Hanna, was "usually double" that of nonminorities. On cross-examination Neill initially stated that between April 24, 1973, and November 14, 1977, an individual with skills commensurate with Hanna's "could secure employment ... within a twenty-seven mile commuting area" of Kenosha. Neill then qualified that statement on redirect examination and admitted that the probability of finding "comparable" employment was "substantially lower" and, in fact, within the same twenty-seven mile radius, there was *"no comparable employment to American Motors when all factors [were] concerned [sic]."* (emphasis added). Based upon this testimony, the trial judge ruled, in pertinent part:

> *"I further find that the plaintiff did not abandon his willingness to return to work by becoming a student at UW-Parkside in September of 1973. I believe his decision to return to school can more accurately be characterized as pursuing an alternative that was better than anything else Mr. Hanna had going for him at the moment. Had he been offered a job at AMC with the correct seniority date, I find that he would have either quit school and returned to the job or would have restructured his school courses so that he*

*could return to full time employment while still remaining a student.*

> *I do find, however, that Mr. Hanna's full time schooling interfered with his duty to mitigate his damages. Although he did secure some employment, it was of a seasonal nature, consistent with the kind of job that college students secure while continuing their educations.*

> *Furthermore, I find that work of a somewhat comparable nature to the unskilled labor performed by Mr. Hanna at AMC was available in the Kenosha area in which Mr. Hanna lived during the period in question. Although it might have been difficult to find an unskilled laborer's job that paid as handsomely as did the one at AMC, Mr. Hanna nevertheless should have more diligently pursued work that was available. Thus, I find that to a significant extent, AMC has demonstrated that Mr. Hanna has failed to properly mitigate his damages.*

I find no failure of a duty to mitigate between December 18, 1970 and February 28, 1971. Thus, during that period, I find that $1,100.74 is an appropriate amount to be awarded to the plaintiff. As to the remaining claim for $28,905.00, *I find that a reduction should be made for failure to mitigate, the most important element of which was the plaintiff's enrollment for almost three years as a full time college student. Although, as I have said, I do not view his act as a waiver of his right to seek reinstatement at AMC, I believe it significantly cooled his ardor for job hunting.* I believe a 70% reduction for failure to mitigate on this point is appropriate, and thus I award the plaintiff $8,671.50 for post-April 1973 damages. On the December 18, 1970 to February 28, 1971 award of $1,100.74, I believe a further award of post-judgment interest from June 23, 1977 (the date of the decision in Hanna I) to date is appropriate. Because of the closeness of the liability question and the good faith of AMC in reasonably construing its collective bargaining agreement with the UAW (in other words, I do not in any

way view this case as one where AMC blatantly disregarded the rights of a veteran), I will not award interest on the damages found to be due for the period of time that followed April 24, 1973." (emphasis added).

On appeal, Hanna contends that:

A. The district court exceeded the directive of this court in *Hanna I.*

B. The district court erred in finding that Hanna failed to mitigate damages.

C. The district court erred in not awarding Hanna prejudgment interest.

On cross-appeal, AMC contends that:

D. The United States Supreme Court's decision in *Ford Motor Co. v. EEOC,* 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982), precludes Hanna from recovering lost wages for the period between April 24, 1973, and November 14, 1977.

We shall consider these issues individually.

## II

### A. *HANNA I*

The appellant initially contends that this court's language in footnote 2 of *Hanna I* required the district court, on remand, to compensate Hanna with full lost wages from April 24, 1973, to November 14, 1977, if AMC failed to show that Hanna "abandoned his willingness" to continue in AMC's employ when he enrolled in UW-Parkside. In footnote 2 of *Hanna I* this court stated:

"[Hanna is] entitled to recover lost wages from April 24, 1973, when he left [AMC's] employ, to date unless on remand [AMC] can show that [Hanna] abandoned his willingness to continue in its employ under the conditions mandated by the [Veterans' Reemployment Rights] Act when he enrolled in the University of Wisconsin-Parkside in September 1973 as a student seeking a degree."

557 F.2d at 122 n. 2. The appellant reasons that he should have been fully compensated for the wages lost during this period because the district court explicitly found that Hanna "did not abandon his willingness to return to work by becoming a student at UW-Parkside in September of 1973."

In construing this court's language in footnote 2 of *Hanna I,* it is important to note that we used the words "entitled to recover lost wages" based upon our interpretation of 38 U.S.C. § 2022 (1976), which provides:

"If any employer, who is a private employer or a State or political subdivision thereof, fails or refuses to comply with the provisions of section 2021(a), (b)(1), or (b)(3), or section 2024, the district court of the United States for any district in which such private employer maintains a place of business, or in which such State or political subdivision thereof exercises authority or carries out its functions, *shall have the power,* upon the filing of a motion, petition, or other appropriate pleading by the person *entitled to the benefits of such provisions,* specifically to require such employer to comply with such provisions and to compensate such person for any loss of wages or benefits suffered by reason of such employer's unlawful action. Any such compensation shall be in addition to and shall not be deemed to diminish any of the benefits provided for in such provisions...." (emphasis added).

In *Hanna I* this court determined that AMC had failed to comply with 38 U.S.C. § 2021 (1976), and that pursuant to 38 U.S.C. § 2022 (1976), unless the trial court found that Hanna had abandoned his willingness to return to AMC's employ, Hanna was *entitled* to the wages he lost as a result of AMC's non-compliance.

■ Title 38 U.S.C. § 2022 (1976) also provides, however, that the district court "shall have the power" to compensate an entitled employee with lost wages. Contrary to the appellant's position, the statute does not mandate the district court to compensate an entitled employee, rather it only affords the district court the power to do so. In *Levine v. Berman,* 178 F.2d 440 (7th Cir.1949) ("*Levine*"), this court interpreted section 8 of the Selective Training and Service Act of 1940, 50 U.S.C.App. § 308

(1946), the predecessor to 38 U.S.C. § 2021 *et seq.*,[4] which provided in pertinent part:

> "In case any private employer fails or refuses to comply with the provisions of subsection (b) . . ., the district court of the United States . . . *shall have power,* upon the filing of a motion, petition, or other appropriate pleading by the person entitled to the benefits of such provisions, to specifically require such employer to comply with such provisions, and, as an incident thereto, *to compensate such person for any loss of wages or benefits suffered by reason of such employer's unlawful action.*" (emphasis added).

178 F.2d at 444. We held in *Levine* that the phrase "shall have power," in the context of a veterans' reemployment statute, affords the district court discretion to compensate an entitled employee. *Id.* at 445. *Accord O'Mara v. Petersen Sand & Gravel Co.,* 498 F.2d 896, 898 (7th Cir.1974). In this instance, the district court awarded Hanna lost wages but reduced the award based upon its finding that Hanna failed to mitigate damages. The district court's actions were within its discretionary power to award damages under 38 U.S.C. § 2022 (1976). *See id.* We next consider whether the district court abused its discretionary power by finding that Hanna failed to mitigate damages.

## B. FAILURE TO MITIGATE

The appellant contends that AMC failed to meet its burden of proof on the affirmative defense of mitigation, and thus, the district court erred in finding that "to a significant extent, AMC has demonstrated that Mr. Hanna has failed to properly mitigate his damages." To support this conten-

tion, the appellant notes that AMC, without calling any of its own witnesses at the trial for damages, simply introduced Hanna's UW-Parkside student transcript and cross-examined Hanna's witnesses in an attempt to prove that Hanna failed to mitigate damages.

This court has, in the past, recognized the duty of an employee, who returns from military service and is wrongfully denied employment by his previous employer, to mitigate damages. In *Levine* we interpreted section 8 of the Selective Training and Service Act of 1940, 50 U.S.C.App. § 308 (1946), the predecessor to 38 U.S.C. § 2021 *et seq.*,[5] and stated, "[u]nder the general rule of damages, where one is injured or damaged by the wrongful act of another, he is bound to exercise reasonable care and diligence in mitigating the resulting damage. . . ." 178 F.2d at 444 (citing *Van Doren v. Van Doren Laundry Service,* 68 F.Supp. 938, 941 (D.C.N.J.1946)). *See also O'Mara v. Petersen Sand & Gravel Co.,* 498 F.2d at 897–98; *Helton v. Mercury Freight Lines, Inc.,* 444 F.2d 365, 368 (5th Cir.1971); *Loeb v. Kivo,* 169 F.2d 346, 350 (2nd Cir. 1948). More recently, in *Peel v. Florida Department of Transportation,* 500 F.Supp. 526 (N.D.Fla.1980), the United States District Court for the Northern District of Florida applied this "mitigation of damages" principle standard to the Vietnam Veterans' Readjustment Act. *See also Chaltry v. Ollie's Idea, Inc.,* 546 F.Supp. 44, 52 (W.D.Mich.1982).

We further note that in the area of employment discrimination, when employees seek lost wages for the period of discrimination, this court requires the employee to

**4.** As this court stated in *Hanna I:*

> "The original statute establishing veterans' reemployment rights was the Selective Training and Service Act of 1940, 54 Stat. 885. The name of the Act was changed in 1948 to the Selective Service Act of 1948, 62 Stat. 604, and again in 1951 to Universal Military Training and Service Act, 65 Stat. 75. In 1967 the Act was renamed the Military Selective Service Act of 1967, 81 Stat. 100, and in 1971 the name was changed to Military Selective Service Act, 85 Stat. 348, and found at 50 U.S.C.App. § 459. The reemployment

provisions of the Military Selective Service Act were codified in 1974 with nonsubstantive wording changes in the Vietnam Veterans' Readjustment Act of 1974, 88 Stat. 1578, 38 U.S.C. § 2021 *et seq.* The reemployment provision of the various Acts are substantially identical. Thus the judicial precedents developed under them are largely interchangeable."

557 F.2d at 119 n. 1.

**5.** *See* footnote 4.

initially establish the amount of damages. The burden then shifts to the employer to prove, as an affirmative defense, that the employee failed to mitigate those damages. As we stated in *Sprogis v. United Airlines, Inc.*, 517 F.2d 387 (7th Cir.1975) (*"Sprogis"*), "once the plaintiff has proven [his] case and established what [he] contends to be [his] damages, the burden of going forward to mitigate the liability, or, to rebut the damage claim, rests with the defendant." 517 F.2d at 392. In order to satisfy its burden of proof, the employer must show that:

> "(1) the plaintiff *failed to exercise reasonable diligence* to mitigate his damages, and
>
> (2) there was a reasonable likelihood that the plaintiff might have found *comparable work by exercising reasonable diligence.*" (emphasis added).

*Syvock v. Milwaukee Boiler Mfg. Co.*, 665 F.2d 149, 159 (7th Cir.1981). *See also Jackson v. Shell Oil Corp.*, 702 F.2d 197, 202 (9th Cir.1983); *EEOC v. Sandia Corp.*, 639 F.2d 600, 627 (10th Cir.1980); *Sias v. City Demonstration Agency*, 588 F.2d 692, 696 (9th Cir.1978); *Ballard v. El Dorado Tire Co.*, 512 F.2d 901, 906 (5th Cir.1975); *NLRB v. Nickey Chevrolet Sales, Inc.*, 493 F.2d 103, 107–08 (7th Cir.), *cert. denied*, 419 U.S. 834, 95 S.Ct. 60, 42 L.Ed.2d 60 (1974). Due to the factual similarity of an employment discrimination case and a case arising under the Vietnam Veterans' Readjustment Act, we apply the two-pronged mitigation test in this instance.[6] *See, e.g., Peel v. Florida Department of Transportation*, 500 F.Supp. at 528.

According to the first prong of the test, once Hanna established the amount of his damages, AMC was required to raise mitigation as an affirmative defense and demonstrate that Hanna failed to exercise "reasonable diligence" in obtaining comparable employment between April 24, 1973, and November 14, 1977. This court stated in *Sprogis* that reasonable diligence in seeking comparable employment includes "check[ing] want ads, register[ing] with employment agencies, and discuss[ing] employment opportunities with friends and acquaintances." 517 F.2d at 392. Furthermore, "[i]n *Sprogis* we held that an employment discrimination plaintiff's formal application for one job and her procurement of another, temporary, position during a two-year period constituted 'reasonable diligence' in attempting to find alternative employment . . . ." *Orzel v. City of Wauwatosa Fire Dept.*, 697 F.2d 743, 756 (7th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 484, 78 L.Ed.2d 680 (1983) (*"Orzel"*). Similarly, in *Orzel* we held that an assistant chief of the Wauwatosa Fire Department, who, during a two-year period, worked as a temporary census taker, applied for a job with the United States Postal Service but was not hired, and placed his name on file with the Wisconsin Job Service, did not fail to mitigate damages. *Orzel*, 697 F.2d at 756–57.

In this instance, AMC failed to introduce a scintilla of evidence to contradict or discredit Hanna's testimony that he had placed applications on file with various employers, registered with the employment office, discussed employment opportunities with others, checked the want-ads, or secured temporary employment, between April 24, 1973, and November 14, 1977. Instead, AMC introduced Hanna's UW-Parkside student transcript into evidence and relied upon the rationale of *Taylor v. Safeway Stores, Inc.*, 524 F.2d 263, 268 (10th Cir.1975) (*"Taylor"*), to claim that Hanna's enrollment as a full-time, day student at UW-Parkside constituted a failure to mitigate damages. In *Taylor* the United States Court of Appeals for the Tenth Circuit held that the district court had not abused its discretion to award damages, under 42 U.S.C. § 2000e–5(g), by not including the time of an employee's school attendance in the damage computa-

---

**6.** In an employment discrimination case the employee seeks damages, in the form of lost wages, for the period of discrimination, and the employer attempts to show that the employee failed to mitigate those damages. An analo-gous situation is present in this instance, Hanna seeks damages, in the form of lost wages, for the period he was denied employment with seniority, and AMC attempts to show that Hanna failed to mitigate those damages.

tion. The court reasoned that, "[w]hen an employee opts to attend school, curtailing present earning capacity in order to reap greater future earnings, a back pay award for the period while attending school also would be like receiving a double benefit." 524 F.2d at 268.

The record reveals that Hanna, who enrolled in a total of sixty-six credit hours at UW-Parkside but earned only sixteen credit hours, offered uncontradicted testimony that he obtained no employment from the skills he learned at UW-Parkside and the only reason he enrolled in school was because he "didn't have a job . . . and it was a means of getting some money and income [from veterans' benefits] and plus learning something." Additionally, the parties stipulated to the amount of veterans' benefits Hanna received under the "G.I. bill" while attending school, and subtracted that amount, along with the money Hanna earned from the Wisconsin Natural Gas Company and the Kenosha County Parks Commission, from the total amount of lost wages due for the period between April 24, 1973, and November 14, 1977.[7] Accordingly, Hanna will receive no double benefit for the period he attended UW-Parkside because of the court approved stipulation that subtracted all the veterans' benefits he received ($7,016.00), while in school, from the damage claim. Furthermore, the district court found that:

> "[Hanna] did not abandon his willingness to return to work by becoming a student at UW-Parkside in September of 1973. . . . [H]is decision to return to school [was] more accurately . . . characterized as . . . an alternative that was better than anything else Mr. Hanna had going for him at the moment."

The court added that:

> "Had [Hanna] been offered a job at AMC with the correct seniority date, I find that he would have either quit school and returned to the job or would have restructured his school courses so that he

could return to full time employment while still remaining a student."

The evidence presented at the trial for damages revealed that Hanna entered school not to "reap greater future earnings" but because he "didn't have a job . . . and it was a means of getting some money and income" from veterans' benefits. Thus, we agree with the district court that Hanna enrolled in school only because that "alternative . . . was better than anything else [he] had going for him at the moment." Hanna's uncontradicted testimony, that while attending UW-Parkside he applied for and was at all times ready, willing, and available to accept employment comparable to that of AMC, and the district court's finding that Hanna "did not abandon his willingness to return to work by becoming a student at UW-Parkside," reveal that Hanna had not "curtail[ed] his present earning capacity." Accordingly, the rationale of *Taylor,* that an award of lost wages for the period in which one attends school, and thereby curtails his present earning capacity in order to reap greater future earnings, constitutes a double benefit, certainly does not apply to the facts in this instance. *See, e.g., Washington v. Kroger Co.,* 671 F.2d 1072, 1079 (8th Cir.1982). In light of the fact that Hanna's testimony remained uncontradicted, the record is void of any other proof on AMC's behalf that Hanna "failed to exercise reasonable diligence in mitigating his damages."

Consequently, the district court's findings of fact that Hanna "should have more diligently pursued work that was available" and that Hanna's enrolling at UW-Parkside "significantly cooled his ardor for job hunting" find no support in the record. In addition, these unsupported findings directly conflict with the district court's finding that:

> "Had [Hanna] been offered a job at AMC with the correct seniority date, I find that he would have either quit school

---

7. AMC and Hanna stipulated that Hanna received $7,016.00 in veterans' benefits under the "G.I. bill" between April 24, 1973 and November 14, 1977. In addition, Hanna earned $598.00 while employed by the Wisconsin Natural Gas Company and $1,312.00 while employed by the Kenosha County Parks Commission.

and returned to the job or would have restructured his school courses so that he could return to full time employment while still remaining a student."

AMC offered no evidence to contradict the testimony of Hanna or Kenneth Neill, supervisor of Kenosha Job Service, and the district court found neither witnesses' testimony incredible. Moreover, we are unable to find any evidence in the record to contradict the testimony of Hanna or Neill, or to contradict our acceptance of their testimony as a verity. *See, e.g., Royal Business Machines v. Lorraine Corp.,* 633 F.2d 34, 47 (7th Cir.1980); *Apolskis v. Concord Life Insurance Co.,* 445 F.2d 31, 34 (7th Cir.1971).

■ At the trial for damages, Hanna established that he visited the Kenosha Job Service office, personally placed applications on file at factories in Waukegan, Illinois, Racine, Wisconsin, and Kenosha, Wisconsin, read the want-ads of the *Kenosha News,* discussed employment opportunities with friends, and worked at least two jobs between April 24, 1973, and November 14, 1977. These actions are more than sufficient to constitute "reasonable diligence" on the part of Hanna. *Accord Orzel,* 697 F.2d at 756–57; *Sprogis,* 517 F.2d at 392–93. In light of AMC's failure to introduce evidence to the contrary and in view of present case law, we hold that the district court's findings of fact that Hanna "should have more diligently pursued work that was available" and that Hanna's enrolling in UW-Parkside "significantly cooled his ardor for job hunting" are clearly erroneous.[8]

■ In addition, AMC utterly failed to establish that "there was a reasonable likelihood [Hanna] might have found comparable work" between April 24, 1973, and November 14, 1977. The only evidence in the record on this point consists of Neill's testimony that though work was available for an unskilled laborer within a twenty-seven mile commuting area of Kenosha, there was "no *comparable* employment to American Motors when all factors [were] concerned [sic]." (emphasis added). AMC offered no evidence to rebut this testimony or to show that jobs existed which were comparable in "pay, status, and other factors to the position" at AMC. *Marshall v. Arlene Knitwear, Inc.,* 454 F.Supp. 715, 730 (E.D.N.Y. 1978). *See also Ballard v. El Dorado Tire Co.,* 512 F.2d at 906. The fact that Hanna left two jobs which were not comparable to AMC is of no consequence. A veteran who has been denied reemployment in violation of the Vietnam Veterans' Readjustment Act, has no duty, under the principles of mitigation, to continue at a job which is not comparable to his previous position. As we stated in *O'Mara v. Petersen Sand & Gravel Co.,* 498 F.2d at 897–98, a case arising under the Military Service Act of 1971, 50 U.S.C. App. § 451 *et seq.* (Supp. I 1971), the predecessor to 38 U.S.C. § 2201, *et seq.,*[9] "[the plaintiff] did not improperly fail to mitigate damages by quitting ... as a laborer, a position inferior to the position as scalemaster." *See also Hanna I,* 557 F.2d at 122 (Hanna did not waive his rights under the Act by his April 24, 1973, refusal to continue in the inferior status afforded him by the defendant). Thus the district court's finding of fact that "work of a somewhat comparable nature to the unskilled labor performed by Mr. Hanna at AMC was available in the Kenosha area in which Mr. Hanna lived during the period in question," is not supported by the record and, therefore, is clearly erroneous.

**8.** In reviewing the district court's finding of fact we are bound by the finding unless it is clearly erroneous. Fed.R.Civ.P. 52(a). Thus, unless we are left with a "definite and firm conviction that a mistake has been committed," *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948), we must accept the trial court's findings. *See Inwood Laboratories v. Ives Laboratories,* 456 U.S. 844, 855, 102 S.Ct. 2182, 2188, 72 L.Ed.2d 606 (1982). In this instance, AMC's failure to introduce any evidence, other than

Hanna's UW-Parkside student transcript, on the issue of Hanna's "reasonable diligence," leaves us with a "definite and firm conviction" that the trial court erred in finding that Hanna "should have more diligently pursued work that was available" and that Hanna's enrolling in UW-Parkside, "significantly cooled his ardor for job hunting."

**9.** *See* footnote 4.

■ In light of Hanna's repeated and continuous efforts to secure employment,[10] and the absence of any proof by AMC concerning Hanna's lack of reasonable diligence or the availability of comparable employment, we conclude that AMC failed to meet its burden of proof on the issue of mitigation. *See, e.g., NLRB v. Nickey Chevrolet Sales, Inc.*, 493 F.2d at 108. Accordingly, we hold the district court's findings of fact that:

> "[w]ork of a somewhat comparable nature to the unskilled labor performed by Mr. Hanna at AMC was available in the Kenosha area in which Mr. Hanna lived during the period in question[;] ... Mr. Hanna ... should have more diligently pursued work that was available[;] ... AMC has demonstrated that Mr. Hanna has failed to properly mitigate his damages [; and]

> \* \* \* \* \* \*

> [Hanna's] enrollment for almost three years as a full time college student ... significantly cooled his ardor for job hunting[,]"

are not supported by the record and thus are clearly erroneous. Based upon the evidence presented at the trial for damages, AMC did not demonstrate that Hanna failed to mitigate his damages. The district court's decision, therefore, to reduce the amount of lost wages awarded Hanna for the period between April 24, 1973, and November 14, 1977, due to Hanna's apparent failure to mitigate damages, rises to an abuse of discretion. Accordingly, we hold that the appellant is to receive compensation for his wages lost during the period between April 24, 1973, and November 14, 1977, less the stipulated amount received as veterans' benefits under the "G.I. bill" and the stipulated amounts earned from employment with the Wisconsin Natural Gas Co. and the Kenosha County Parks Commission. In sum, Hanna is to receive $28,905.00 rather than the $8,671.50 awarded by the district court, for the period of his wrongful discharge from April 24, 1973, until November 14, 1977.[11]

## C. PREJUDGMENT INTEREST

The appellant next contends that he is entitled to the interest which accrued before June 23, 1977, the date of this court's decision in *Hanna I*, on the damages awarded by the district court for the period between December 18, 1970, and February 28, 1971, and to the interest which accrued before October 27, 1982, the date of the district court's decision, on the damages awarded for the period between April 24, 1973, and November 14, 1977. Appellant initially refers to the district court's ruling which provided, in pertinent part:

> "On the December 18, 1970 to February 28, 1971 award of $1,100.74, I believe a further award of post-judgment interest from June 23, 1977 (the date of the decision in *Hanna I*) to date is appropriate. Because of the closeness of the liability question and the good faith of AMC in reasonably construing its collective bargaining agreement with the UAW (in other words, I do not in any way view this case as one where AMC blatantly disregarded the rights of a veteran), I will not award interest on the damages found to be due for the period of time that followed April 24, 1973."

Appellant asserts that "good faith is not a defense to prejudgment interest," in a case arising under the Vietnam Veterans' Readjustment Act, *see Hembree v. Georgia Power Co.*, 637 F.2d 423, 429–30 (5th Cir.1981), thus, in this instance, the trial judge erred

---

**10.** According to United States Court of Appeals for the Tenth Circuit in *EEOC v. Sandia Corp.*, 639 F.2d 600 (10th Cir.1980) "[a] claimant is required to make only reasonable exertions to mitigate damages, and is not held to the highest standard of diligence. It does not compel him to be successful in mitigation. It requires only an honest good faith effort." 639 F.2d at 627

(quoting *United States v. Lee Way Motor Freight, Inc.*, 625 F.2d 918, 938 (10th Cir.1979)).

**11.** Appellant is entitled to $37,831.00 in lost wages, less $8,926.00 for money received as veterans' benefits under the "G.I. bill" and money earned from his employment with the Wisconsin Natural Gas Company and the Kenosha County Parks System.

by refusing to grant Hanna prejudgment interest on the damage award.

◼ Though the award of prejudgment interest in an action under the Vietnam Veterans' Readjustment Act lies within the trial judge's discretion, *Hembree v. Georgia Power Co.,* 637 F.2d at 429; *Chernoff v. Pandick Press, Inc.,* 440 F.Supp. 822, 827 (S.D.N.Y.1977), we note the United States Supreme Court's language in *Fishgold v. Sullivan,* 328 U.S. 275, 66 S.Ct. 1105, 90 L.Ed. 1230 (1946) that:

> "The Act was designed to protect the veteran in several ways. He who was called to the colors was not to be penalized on his return by reason of his absence from his civilian job. He was, moreover, to gain by his service for his country an advantage which the law withheld from those who stayed behind.
>
> \*   \*   \*   \*   \*   \*
>
> This legislation is to be liberally construed for the benefit of those who left private life to serve their country in its hour of great need. . . ."

328 U.S. at 284–85, 66 S.Ct. at 1110–1111. *See also Coffy v. Republic Steel Corp.,* 447 U.S. 191, 196, 100 S.Ct. 2100, 2104, 65 L.Ed.2d 53 (1980); *Alabama Power Co. v. Davis,* 431 U.S. 581, 584–85, 97 S.Ct. 2002, 2004–2005, 52 L.Ed.2d 595 (1977); *Dyer v. Hinky Dinky, Inc.,* 710 F.2d 1348, 1350 (8th Cir.1983); *Hanna I,* 557 F.2d at 119–20. The purpose of the Vietnam Veterans' Readjustment Act "is that the veteran should be *made whole,* and reimbursed for the measurable wage disadvantage or loss suffered through his incorrect reinstatement." (emphasis added). *Helton v. Mercury Freight Lines, Inc.,* 444 F.2d at 367. Finally,

> "[i]nterest is a proper ingredient of the instant 'make whole' remedy and should be granted. Prejudgment interest is viewed as effectuating the purposes of the Act, particularly that of encouraging reemployment of veterans . . . at the earliest opportunity."

*Peel v. Florida Department of Transportation,* 500 F.Supp. at 528 (and cases cited therein).

◼ In accord with the policy of the Vietnam Veterans' Readjustment Act that "one called to the colors [is] not to be penalized upon his return by reason of his absence from his civilian job," *Fishgold v. Sullivan,* 328 U.S. at 284, 66 S.Ct. at 1110, the trial judge's discretion in awarding prejudgment interest must be guided by the principle of "making whole" the returning veteran. Thus, the employer's denial of employment to a returning veteran, based upon an apparent "good faith" reliance on the Union bargaining agreement, is of no consequence in a case arising under the Vietnam Veterans' Readjustment Act. For as the United States Supreme Court stated in *Fishgold, "no practice of employers or agreements between employers and unions can cut down the service adjustment benefits which Congress has secured the veteran under the Act."* (emphasis added). 328 U.S. at 285, 66 S.Ct. at 1111. Furthermore, as this court stated in *Hanna I,* with regard to Hanna's original "lay off," "[i]t is irrelevant that [AMC] may have laid [Hanna] off in good faith." 557 F.2d at 122.

◼ Applying that rationale to the facts of this instance, the district court's reliance upon "the good faith of AMC" in order to deny Hanna prejudgment interest, and thus prevent him from being "made whole," was improper. *See Hembree v. Georgia Power Co.,* 637 F.2d at 429–30; *Coffy v. Republic Steel Corp.,* 91 Lab.Cas. ¶ 12,843 (N.D.Ohio 1981) (on remand from the United States Supreme Court). In addition, the district court's reliance upon the "closeness of the liability question" in order to deny Hanna prejudgment interest was also improper, in light of our holding that the liability question is well-settled and AMC owes Hanna full wages lost for the period between April 14, 1973, and November 24, 1977. Thus, in furtherance of our duty to liberally construe the Act for those "called to the colors" we hold that the district court's denial of prejudgment interest, based upon AMC's apparent "good faith" and "closeness of the liability question" without any apparent regard for the policy to "make whole" a returning veteran, rises to an abuse of discre-

tion. *Accord Hembree v. Georgia Power Co.,* 637 F.2d at 430. *Contra, Chernoff v. Pandick Press, Inc.,* 440 F.Supp. at 827.[12]

In order that Hanna be "made whole," we award him prejudgment interest, at the rate of 7% per annum, on the $28,905.00 awarded in lost wages for the period between April 24, 1973 and November 14, 1977.[13] We calculate the total amount of prejudgment interest on this award to be $15,347.56.[14] In addition, we award Hanna prejudgment interest, at the rate of 7% per annum, on the $1,100.74 awarded by the district court for the period between December 18, 1970, and February 28, 1971. We calculate this interest, which accrued before this court's decision in *Hanna I,* to be $487.97.[15]

## D. *FORD MOTOR CO. v. EEOC*

Cross-appellant, AMC, contends that the United States Supreme Court's decision in *Ford Motor Co. v. EEOC,* 458 U.S. 219, 102

S.Ct. 3057, 73 L.Ed.2d 721 (1982), precludes Hanna from recovering any lost wages for the period between April 24, 1973, and November 14, 1977. AMC reasons that when it reemployed Hanna on March 22, 1973, as a "new hire," following his honorable discharge from the Armed Forces, AMC was relieved of any future duty to pay Hanna lost wages. In *Ford Motor Co. v. EEOC,* the United States Supreme Court held that when Ford refused to hire three qualified women for a certain position, instead hired three qualified men, later offered the same position to two of the women without seniority retroactive from their original application, and was then found liable for sex-based employment discrimination in violation of 42 U.S.C. § 2000e–2(a), Ford was not required to compensate the women for lost wages which accrued after Ford's job offer without retroactive seniority.

Following a careful reading of *Ford Motor Co. v. EEOC,* we conclude that the

---

**12.** The district court reasoned in *Chernoff v. Pandick Press* that, "[b]y receiving his lost wages as a lump sum, [plaintiff] will find himself in a much better financial position than if he had been continuously employed by [defendant]. . . . [Plaintiff] will have been at least fully 'made whole' even without an award of [prejudgment] interest." The district court failed to support 'this novel and unique theory with any case law and we are unable to find any case law providing that a returning veteran who is denied prejudgment interest is "made whole," within the meaning of the Vietnam Veterans' Readjustment Act, simply because he received lost wages in a lump sum payment. In fact, according to the "legislation's overall purpose . . . the [returning] veteran should be made whole, *and reimbursed for the loss suffered through his incorrect reinstatement,*" (emphasis added) *Helton v. Mercury Freight Lines, Inc.,* 444 F.2d at 367, including the interest that would have accrued on the lost wages unlawfully denied the veteran. *Accord Hembree v. Georgia Power Co.,* 637 F.2d at 430; *Green v. Oktibbeha County Hospital,* 526 F.Supp. 49, 53 (N.D.Miss.1981); *Coffy v. Republic Steel Corp.,* 91 Lab.Cas. ¶ 12,843 (N.D. Ohio 1981) (on remand from the United States Supreme Court); *Peel v. Florida Department of Transportation,* 500 F.Supp. at 528.

**13.** Pursuant to Fed.R.App.P. 37, "[i]f a judgment is modified or reversed with a direction that a judgment for money be entered in the district court, the mandate shall contain instructions with respect to allowance of interest." In this instance, we instruct the district court to apply an interest rate of 7% per annum, the statutory interest rate in Wisconsin for the majority of the time in question. *See* Wis.Stats. § 814.04 (1977).

**14.** Due to the fact that this lawsuit originated in 1975, and has been before this court on three separate occasions, we have calculated the prejudgment interest award in order to facilitate and expedite payment of the same in the district court.

According to the AMC wage schedule between April 24, 1973, and November 14, 1977, after subtracting the amount of veterans' benefits and the wages earned from the Wisconsin Natural Gas Company and the Kenosha County Parks System, Hanna would have received $3,911.81 in 1973, $5,798.00 in 1974, $6,643.64 in 1975, $5,419.72 in 1976, and $7,133.38 in 1976. The prejudgment interest accruing on this amount, between April 24, 1973, and the date of the district court's decision on October 27, 1982, is $15,347.56.

**15.** The district court has already awarded $408.00 in postjudgment (post-*Hanna I*) interest on the $1,100.74 award for the period between December 18, 1970, and February 28, 1971. To that award of interest, we now add prejudgment interest, accruing between February 28, 1971, and June 23, 1977, (pre-*Hanna I*) in the amount of $487.97.

Court's holding is inapplicable to this case which arises under the Vietnam Veterans' Readjustment Act. Title 38 U.S.C. § 2021(b) requires that the veteran be "reemployed without loss of seniority" and that the veteran be given "such status in ... employment as [he] would have enjoyed if [he] had continued in such employment continuously...." Additionally, the United States Supreme Court has stated that a veteran "does not step back on the seniority escalator at the point he stepped off. He steps back on at the precise point he would have occupied had he kept his position continuously during the war." *Fishgold v. Sullivan Corp.*, 328 U.S. at 284–85, 66 S.Ct. at 1110–1111. If an employer adhered to the holding of *Ford Motor Co. v. EEOC* and offered the returning veteran his previous job but refused to grant the veteran proper seniority and status, the employer would be in direct violation of 38 U.S.C. § 2021(b). Because the application of *Ford Motor Co. v. EEOC* to a case arising under the Vietnam Veterans' Readjustment Act would not only demean the veteran's service to his country but would also promote unlawful activity, we agree with the district court and hold that the decision in *Ford Motor Co. v. EEOC* is inapplicable in this case. *Accord Stevens v. Tennessee Valley Authority*, 699 F.2d 314, 316 (6th Cir.1983).

### III

We reverse the judgment of the district court and award appellant $28,905.00 in lost wages, including prejudgment interest in the amount of $15,347.56, for the period between April 24, 1973, and November 14, 1977. In addition, we award appellant prejudgment interest in the amount of $487.97 on the $1,100.74 in lost wages awarded by the district court for the period between December 18, 1970, and February 28, 1971. The district court is ordered to enter judgment accordingly.

BAUER, Circuit Judge, concurring in part, dissenting in part. I concur with the majority's conclusion that, in the absence of any contrary evidence from the defendant, the plaintiff's evidence established that he exercised reasonable diligence in seeking comparable employment.

In my opinion, however, the majority has misconstrued the prejudgment interest issue. The majority's exclusive reliance on the proposition that the district court's discretion "must be guided by the principle of 'making whole' the returning veteran," is incorrect. Rather, absent an explicit statutory directive requiring an award of prejudgment interest, in exercising its discretion the district court may consider other factors, including "an assessment of the equities" presented in the case. *See, e.g., Lodges 743 & 1746, International Association of Machinists v. United Aircraft Corp.*, 534 F.2d 422, 446 (2d Cir.1975), *cert. denied*, 429 U.S. 825, 97 S.Ct. 79, 50 L.Ed.2d 87 (1976) (case arising under labor laws). The district court's consideration in this case of the amount of the plaintiff's recovery relative to the "closeness of the liability question" thus does not constitute an abuse of discretion. Moreover, even if the "make whole" policy of the Vietnam Veterans' Readjustment Act precludes such a consideration, nothing in the district court's opinion indicates that the award of $28,905.00 lost wages is insufficient to make the plaintiff whole, as did the lost wages in *Chernoff v. Pandick Press, Inc.*, 440 F.Supp. 822, 827 (S.D.N.Y.1977). It is the district court's discretion that should control the result in this case. Accordingly, I dissent from that portion of the majority opinion.